WILLIAM ERNEST WELTER V. STATE OF NEBRASKA.

FILED NOVEMBER 18, 1925. No. 24108.

1. **Criminal Law: TRIAL: REVIEW.** The order of proof and the general conduct of a trial rest largely in the sound discretion of the trial court, and, in order to work a reversal of a judgment of conviction, its rulings must be shown to be not only erroneous, but to have imposed some hardship upon, or worked some prejudice to, defendant.

2. ————: **REVIEW.** The rulings of the court made on the introduction of evidence have been examined, and *held* free from error.

3. **Homicide: INSTRUCTIONS.** On the trial of one charged with murder in the first degree, it is not error for the court to submit for the determination of the jury the questions whether or not defendant is guilty of murder in the first degree, or murder in the second degree, notwithstanding the jury subsequently finds him guilty of manslaughter only, when there is evidence in the record upon which they might have found him guilty of murder in either the first or second degree.

4. ————: ————. The rulings of the court on instructions to the jury have been examined, and *held* free from error.

5. ————: **SENTENCE.** The court, under the authority of section 10186, Comp. St. 1922, imposes a sentence on defendant of five years confinement in the penitentiary on the same terms and conditions as fixed in the sentence pronounced by the district court, the term to run from the date that judgment was pronounced.

ERROR to the district court for Douglas county: JAMES M. FITZGERALD, JUDGE. *Affirmed.*

*Jamieson, O'Sullivan & Southard, McKenzie, Lower & Sheehan* and *Andrew P. Moran,* for plaintiff in error.

*O. S. Spillman, Attorney General,* and *Harry Silverman, contra.*

Heard before MORRISSEY, C. J., DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

MORRISSEY, C. J.

Defendant prosecutes error from a conviction had in the

Welter v. State.

district court for Douglas county of the crime of man-slaughter.  The information charged defendant Welter, James Griffin, and Jayce Banks, jointly, with the crime of murder in the first degree.  Each defendant demanded and was accorded a separate trial.  Although assignments of error are numerous, they may be considered in three general classes, namely, alleged error in the court's rulings on the admission or exclusion of evidence; insufficiency of the evidence to sustain the verdict; and errors in the instructions to the jury.

For some time prior to the commission of the crime charged, Griffin conducted a garage in the city of Omaha and, in connection with this business, dealt in used automobiles.  One Leo Brunson was a friend of Griffin and, to some limited extent, a business associate.  Defendant Welter and his codefendant Banks lived at Nebraska City, but were acquainted with Griffin and Brunson.  Brunson purchased an automobile from Welter for $450, paid $250 of the purchase price, and owed the balance of $200 to Welter.  Subsequently a dispute arose between Brunson and Welter over the balance due on the car.  Brunson is said to have refused payment of this balance because of a mortgage upon the car held by a brother of Welter.  Either to make this collection, or for some reason which is not material, Welter, accompanied by his friend Banks, went from Nebraska City to Omaha, and for a day or two prior to the homicide spent considerable time in and about the garage of their codefendant Griffin, and visited the Taylor battery station.  Welter and Banks, on the afternoon of November 23, 1923, went to the Taylor battery station, and Banks, who was alleged to have been under the influence of liquor, engaged in a dispute with the proprietor.  In the course of the dispute Banks fired several shots from a revolver, but apparently these shots were fired in a spirit of bravado, and not in an attempt to injure any person.  The proprietor took the revolver from Banks, extracted the shells from its cylinder, and ordered him to leave the premises.  Later Banks returned to the battery station and was given his revolver.

Sometime during the afternoon Welter telephoned to Brunson and arranged for Brunson to meet him at the Taylor battery station.   In compliance with this arrangement, Brunson, accompanied by an acquaintance, Henry McArdle, drove to the appointed place.   Brunson stopped his car in the street and was immediately met by Welter and Banks. Welter took a position on one side of the car and Banks upon the other.   It is claimed that they engaged in a conversation about the balance alleged to be due Welter upon the car.   While this conversation, or quarrel, was in progress, Griffin arrived.   There is a sharp dispute in the testimony as to just what occurred upon the arrival of Griffin. According to the testimony for the state, Griffin at once stepped into the tonneau of the touring car and, pressing a revolver against Brunson, ordered him to drive on, while Welter and Banks appear to have stepped upon the running boards.   Brunson, fearing that he was about to be kidnapped by the three defendants, struggled with Griffin for the possession of the revolver and alighted from the car. Welter and Banks grappled with Brunson, and while this struggle was in progress the revolver was discharged, and McArdle, who was occupying the right front seat of the automobile, was shot in the head and mortally wounded. Much of this narrative is undisputed, but, on behalf of defendant, it is claimed that Griffin played merely the part of a peacemaker; that the gun from which the fatal bullet was fired was drawn by Brunson.   But it is either admitted, or proved beyond question, that, following the firing of this fatal shot, the three defendants forced Brunson into the automobile and drove away, with defendant Griffin at the wheel, McArdle dead, or dying, in the seat beside him, Brunson beaten into a state of unconsciousness, lying on the floor of the tonneau, and Welter and Banks occupying the rear seat with their feet resting upon Brunson.   Subsequently the body of McArdle, whose murder is charged in the information in this case, was found partially consumed by fire in a burning haystack a few miles outside the city of Omaha.   Brunson, who was a witness for the state, testi-

fied that, following the assault upon him by the defendants, he was unconscious for a long time and knew not what disposition was made of the body of his friend McArdle; that, when he recovered consciousness, he was still held by the three defendants, and that he understood that this assault upon him had been made, not only because of the balance due upon the automobile, but because he was suspected by Griffin of having knowledge as to the theft of alcohol from Griffin. It is the theory of the state that Griffin was engaged in the unlawful traffic in alcohol, and that he suspected Brunson of being implicated in the theft of his stock, and that the three defendants had conspired together to kidnap him and either murder him or torture him into disclosing the whereabouts of the stolen alcohol. Whatever the motive, the defendants continued to drive about Omaha or her suburbs until after nightfall, when Brunson, having recovered consciousness, during the absence from the car of one of the defendants, made his escape, reported the conduct of defendants to the police, and defendants were arrested during the night.

On the trial neither defendant Welter nor his codefendant Banks took the witness-stand, but their codefendant Griffin was called and testified as a witness for the defense. He denied that there was any conspiracy between himself and his codefendants; denied that the pistol from which was fired the fatal shot belonged to him, but claimed that it was the pistol of Brunson, and that he was playing only the part of a peacemaker. But there is much even in Griffin's testimony that is difficult to explain on any theory other than that of a conspiracy on the part of the three codefendants. It is not denied that, after McArdle had been mortally shot, Brunson was beaten, thrown into the car, and there detained. Griffin testified that McArdle was not dead when they drove away from the Taylor battery station, and that they had driven a short distance before discovering that he was wounded; that they then transferred McArdle from the Brunson car, which the witness was driving, to a Ford car, which they met on the road, driven by a man called

"Smitty," a friend of one of the codefendants, with direc-
tions to "Smitty" to take McArdle to a hospital.  "Smitty"
was not produced as a witness, nor is any excuse attempted
to be given for the failure of defendants themselves to drive
to the hospital.  The story told is so unreasonable that no
intelligent jury could be expected to believe it.  The false-
hood is so apparent that all of Griffin's testimony, except
where corroborated, may well be rejected.

It is not the theory of the state that any of these de-
fendants intended to do violence to McArdle.  He was the
unfortunate victim of what is alleged to have been a crim-
inal conspiracy against Brunson.

In the brief of defendant many criticisms are offered of
the rulings of the court on the admission and exclusion of
evidence.  The order of proof and the general conduct of a
trial rest largely in the sound discretion of the trial court,
and, in order to work a reversal of a judgment of conviction,
its rulings must be shown to be not only erroneous, but to
have imposed some hardship upon, or worked some preju-
dice to, defendant.

After going through the assignments made and reading
the evidence adduced, or offered, we do not find that de-
fendant was prejudiced by any ruling made by the trial
court in relation to the introduction, or exclusion, of evi-
dence.

We are seriously urged to hold that the court erred in
submitting to the jury the charges of murder in the first
degree, and murder in the second degree.  This assignment
must, of course, be determined by the character of the
proof.  If the theory of the state is adopted, and apparently
the jury did adopt it, the three codefendants had entered
into an unlawful conspiracy; Griffin had suddenly appeared,
and, pointing a revolver at Brunson, had ordered him to
drive on.  If this order had been obeyed, it may reasonably
be supposed that in the course of a short time he would be
outside the limits of Omaha, perhaps in a sequestered spot,
under the domination of these three conspirators.  The ex-
tent of the injury, if any, which they might then inflict

upon him may only be conjectured. If the jury, from all the evidence before them, had reached the conclusion that the three codefendants had planned to murder Brunson, then, indeed, they might have been convicted of the murder of McArdle. And the failure of the jury to find defendant guilty of murder either in the first or second degree is not, of itself, sufficient to show that the evidence would not have supported such verdict. Since we conclude that there was evidence which might have supported murder in either the first or second degree, it was not error for the court to submit these degrees of homicide for the consideration of the jury.

The instructions of the court are also criticized. First it is claimed that the instructions defining the different degrees of murder were erroneous. We are, however, unable to discover where they were prejudicial to defendant. He has been acquitted of these two charges. But assignments of error are directed against the instructions relating to the crime of manslaughter. These instructions have been carefully considered, together with the instructions which defendant requested the court to give, but we fail to find any error in the ruling of the court either in the submission of the instructions given, or in the refusal of those tendered.

We are asked to render sentence under section 10186, Comp. St. 1922, and we accordingly fix the term of penal servitude at five years in the state penitentiary on the same terms and conditions as fixed in the judgment of the district court, the term to run from the date of that judgment. With the term thus fixed, the judgment is

AFFIRMED.